IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BEVERLEY EDWARDS, | : | CIVIL ACTION |
| | : | NO. 20-796 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ALBERT EINSTEIN MEDICAL | : | |
| CENTER, | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                    April 6, 2021

## I.    INTRODUCTION

Plaintiff Beverley Edwards alleges Defendant Albert Einstein Medical Center ("AEMC"), her former employer, discriminated against her on the basis of her race and national origin by terminating her employment. She brings claims pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act, and the Pennsylvania Human Relations Act.

AEMC now moves for summary judgment on Edwards's claims against it. Alternatively, AEMC seeks to limit the time period for which Edwards will be eligible for back pay if she prevails on the merits. For the reasons set forth below, AEMC's motion will be denied.

## II.   BACKGROUND[1]

Edwards, who is Black and originally from Jamaica, began her employment as a registered nurse at AEMC's Elkins Park campus in 2007. On March 28, 2018, Edwards was working the nightshift in the Progressive Care Unit ("PCU"). Initially, two other nurses, Andrew Picarella and a nurse whose full name is unknown, were assigned to the PCU during that shift. At some point in the evening, nurse Abigail Cordero came to the unit to provide one-on-one care to "Patient Doe," who demonstrated signs of agitation. Both Picarella and Cordero are White and from the United States.

Doe, who was at risk of falling, was restrained in soft limb restraints. Throughout the evening, Edwards heard him "cursing and carrying on" and "using the 'F' word," and she observed Picarella, Doe's assigned nurse, "busy coming out trying to find apparatus to do different things to control him and grabbing medications after medications." Edwards Dep. 141:19-142:6, ECF No. 19-3. Unbeknownst to Edwards, Doe was paraplegic.

At some point in the evening, Edwards heard Doe's telemetry monitor going off in an abnormal pattern. Because she feared he

---

[1]   As required at the summary judgment stage, the Court views the facts "in the light most favorable" to the nonmoving party and draws "all reasonable inferences" in that party's favor. Young v. Martin, 801 F.3d 172, 174 (3d Cir. 2015).

was experiencing a dangerous dysrhythmia, she entered his room. When she entered, she saw Cordero and Picarella "trying to restrain [Doe], getting him in bed and getting him to calm down." Id. at 146:14-17. Doe was "halfway out" of his soft limb restraints with his legs "off the bed." Id. at 151:5-6, 145:20.

Edwards attempted, unsuccessfully, to calm Doe. She then "reach[ed] for a sheet" and "made a simple tie on one side [of the bed] and handed it across" to Picarella and "[Cordero], who was on the opposite side, holding the patient." Id. at 146:19-147:1. Edwards intended for the sheet to be tied across Doe's bed rails so that he could not fall out of bed. However, instead of tying the sheet on the opposite side of the bed, Picarella wrapped the sheet around Doe's back. As Edwards witnessed him do this, she asked, "Is that how you're going to do that?" Id. at 147:4-5. Picarella did not respond.

Picarella then handed the sheet to Cordero to tie to the other bed rail. Cordero attempted to tie the sheet but was unable to do so. Cordero then "grabbed the patient" while Picarella tugged on the sheet so he had enough slack to tie it. Id. at 147:15-19. Although Edwards thought the restraint "a little excessive," she was not concerned because Doe "was sitting up and did not appear to be in any harm." Id. at 171:13-18. Edwards instructed Cordero and Picarella to remove the sheet as soon as Doe calmed down. She then left the room and did not

return. She did not create a report of the incident or otherwise report the restraint to a supervisor.

Cordero reported the incident to Ryan Ihlenfeldt, the unit's nurse manager, via phone on March 30 (i.e., two days after the incident). That same day, Ihlenfeldt opened an investigation into the incident together with Amy Wilson, a human resources specialist.

Also on March 30, Edwards was suspended pending the investigation. Ihlenfeldt and Wilson interviewed her on April 2. On April 9, Edwards was terminated. The Discharge Document signed by Ihlenfeldt and Wilson stated that Edwards's decision to use a bedsheet as a restraint showed negligence of care. Edwards was replaced by a nurse who is of Asian descent.

Picarella resigned on March 30 after being questioned about the incident and before AEMC made any decision about whether to discipline him. Cordero received verbal counseling but was not disciplined in any way for her involvement in the incident.

Edwards began looking for subsequent employment the next month. In October 2018, she obtained a full-time position as a nurse manager at Elkins Crest, but she was terminated three months later. In August 2019, she accepted a position at Jefferson Health Northeast, where she remains employed.

### III. LEGAL STANDARD

Summary judgment is "appropriate only when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). A fact is material "if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A factual dispute is genuine "if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. If the movant meets this obligation, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. At the summary judgment stage, the Court must view the facts "in the light most favorable to" the nonmoving party and "draw all reasonable inferences in favor" of that party. Young v. Martin, 801 F.3d 172, 174 (3d Cir. 2015).

### IV. DISCUSSION

Edwards alleges AEMC discriminated against her in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act, and the

Pennsylvania Human Relations Act ("PHRA").[2] AEMC moves for summary judgment on all counts. In the alternative, AEMC argues Edwards's economic damages are cut off. The Court will address these arguments in turn.

### A.  Discrimination Claims

Section 1981 provides that all persons "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. A § 1981 plaintiff "bears the burden of showing that race was a but-for cause of its injury." Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1014 (2020).

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race and national origin, inter alia. Title VII plaintiffs can establish race or national origin discrimination by showing that those characteristics were "a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

Edwards's discrimination claims require application of the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Jones v. Sch. Dist. of

_____

[2] Because discrimination claims brought under Title VII and the PHRA "are governed by essentially the same legal standards," the Court need not analyze the PHRA claims separately from the Title VII claims. Connelly v. Lane Constr. Corp., 809 F.3d 780, 791 n.8 (3d Cir. 2016) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000)).

Phila., 198 F.3d 403, 410 (3d Cir. 1999). That framework proceeds in three steps. First, the plaintiff must establish a prima facie case of discrimination. The plaintiff's burden at this stage is "not onerous," as the goal "is to 'eliminate[ ] the most common nondiscriminatory reasons' for the defendant's actions; by doing so, the prima facie case creates an inference that the defendant's actions were discriminatory." Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271 (3d Cir. 2010) (alteration in original) (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981)).

If a plaintiff establishes her prima facie case, "the burden of production shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting McDonnell Douglas, 411 U.S. at 802). This burden is "relatively light" and is satisfied if the employer provides "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).

Finally, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual." Id. "At trial, the plaintiff must convince the factfinder 'both that the

[employer's proffered] reason was false, and that discrimination was the real reason.'" Id. (quoting Hicks, 509 U.S. at 515). Under the burden-shifting framework, "the ultimate burden of proving intentional discrimination always rests with the plaintiff." Id. at 763 (citing Burdine, 450 U.S. at 253).

### 1.   Prima Facie Case

To establish a prima facie case of race or national origin discrimination, a plaintiff must show that she: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. See Jones, 198 F.3d at 410–11; see also Ahmed v. Lowe's Home Ctrs., Inc., 346 F. App'x 816, 820 n.2 (3d Cir. 2009).

While AEMC does not dispute that Edwards satisfies the first three prongs, it argues she cannot establish the fourth prong because the circumstances of her termination do not give rise to an inference of discrimination. However, Edwards satisfies this prong by pointing to evidence supporting an inference that Cordero, who is White and from the United States, was similarly situated to Edwards and received more favorable treatment. See infra Section IV.A.3; see also Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999) ("Common circumstances giving rise to an inference of

unlawful discrimination include . . . the more favorable treatment of similarly situated colleagues outside of the relevant class."); Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008) ("[T]he prima facie case and pretext inquiries often overlap. As our jurisprudence recognizes, evidence supporting the prima facie case is often helpful in the pretext stage, and nothing about the McDonnell Douglas . . . formula requires us to ration the evidence between one stage or the other."), order clarified, 543 F.3d 178 (3d Cir. 2008).

Edwards provides additional support for her prima facie case by highlighting that the nurse who replaced her is of Asian descent and therefore outside of Edwards's protected classification. See Johnson v. Keebler-Sunshine Biscuits, Inc., 214 F. App'x 239, 242 (3d Cir. 2007) ("While this Court no longer requires a plaintiff to show that he was replaced by someone outside of the protected class to establish an inference of discrimination, we find that this evidence establishes the fourth and final element of a prima facie case in this case." (citation omitted)).

For these reasons, Edwards has met her burden, which is "not onerous," of establishing a prima facie case of race and national origin discrimination. See Anderson, 621 F.3d at 271 (quoting Burdine, 450 U.S. at 254).

2.   Legitimate, Nondiscriminatory Reason

Next, AEMC points to record evidence supporting a
legitimate, non-discriminatory reason for the adverse employment
action: Edwards's alleged violation of the organization's
restraint policy. This evidence, taken as true, permits the
conclusion that AEMC had a nondiscriminatory reason for the
adverse employment action. AEMC therefore satisfies its
"relatively light" burden of production. See Fuentes, 32 F.3d at
763.

3.   Pretext

Finally, to defeat summary judgment, Edwards must "point to
some evidence, direct or circumstantial, from which a factfinder
could reasonably either (1) disbelieve the employer's
articulated legitimate reasons; or (2) believe that an invidious
discriminatory reason was more likely than not a motivating or
determinative cause of the employer's action." Id. at 764.

As to the first option, a plaintiff discredits the
employer's proffered reasons for its actions by "demonstrat[ing]
such weaknesses, implausibilities, inconsistencies,
incoherencies, or contradictions" in those reasons "that a
reasonable factfinder could rationally find them 'unworthy of
credence,' and hence infer 'that the employer did not act for
[the asserted] non-discriminatory reasons.'" Id. at 765
(alteration in original) (first quoting Ezold v. Wolf, Block,

Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992); and then
quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638
(3d Cir. 1993)).

As to the second option, a plaintiff presents evidence from
which a factfinder could reasonably conclude that an
illegitimate factor was a motivating or determinative cause of
the adverse employment action by showing, for example, "that the
employer in the past had subjected him to unlawful
discriminatory treatment, that the employer treated other,
similarly situated persons not of his protected class more
favorably, or that the employer has discriminated against other
members of his protected class or other protected categories of
persons." Id.

Here, Edwards raises four arguments in support of a showing
of pretext: (1) AEMC treated Edwards differently than similarly
situated colleagues not of her protected classes; (2) AEMC's
stated reason for terminating her changed over time; (3)
Ihlenfeldt has a history of treating Black employees less
favorably than White employees; and (4) Ihlenfeldt harbors
racial animus. The Court will address these arguments seriatim.

i.   Comparator evidence

First, Edwards argues AEMC treated her less favorably than
a similarly situated colleague.

11

"To be considered similarly situated, comparator employees must be similarly situated in all relevant respects." Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d Cir. 2011) (first citing Russell v. Univ. of Toledo, 537 F.3d 596 (6th Cir. 2008); and then citing Lee v. Kan. City S. Ry. Co., 574 F.3d 253, 259–61 (5th Cir. 2009)). "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." Id. (first citing Lee, 574 F.3d at 259–61; and then citing Burks v. Wis. Dep't of Transp., 464 F.3d 744 (7th Cir. 2006)).

"As a general rule, whether individuals are similarly situated is a factual question for the jury. However, a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met." Hampshire v. Bard, 793 F. App'x 75, 80 (3d Cir. 2019) (quoting McDonald v. Vill. of Winnetka, 371 F.3d 992, 1002 (7th Cir. 2004)).

Edwards argues Cordero is an appropriate comparator. AEMC disagrees, arguing Cordero is not similarly situated to Edwards for the following reasons: (1) Edwards, not Cordero, initiated the improper restraint, while Cordero had limited and "feigned" involvement; (2) Edwards left Doe's room following application of the restraint and did not return; (3) Cordero untied Doe's

restraint; and (4) Cordero reported the improper restraint to
Ihlenfeldt, while Edwards never reported the incident. See
Def.'s Mot. Summ. J. 19, ECF No. 14; Def.'s Reply Supp. Mot.
Summ. J. 6, ECF No. 20-2.

While this argument may be persuasive before the
factfinder, the Court cannot conclude as a matter of law that
Cordero is an inappropriate comparator. The record, construed in
the light most favorable to Edwards, reflects that Cordero and
Edwards were both registered nurses, they had the same job
responsibilities at AEMC, they both worked at least occasionally
in the PCU, they both reported to Ihlenfeldt, and they both
participated in restraining Doe. On this record, a reasonable
jury could find Edwards and Cordero were similarly situated in
all relevant aspects, including with respect to their alleged
misconduct.

By pointing to AEMC's treatment of Cordero, Edwards has
"come forward with sufficient evidence from which a factfinder
could reasonably conclude that an illegitimate factor more
likely than not was a motivating or determinative cause" of
AEMC's decision to terminate her. See Fuentes, 32 F.3d at 765.
Notably, Edwards highlights that Ihlenfeldt and Wilson, upon
launching their investigation, treated Cordero and Edwards
differently: Ihlenfeldt and Wilson had a brief conversation over
the phone with Cordero on March 30 and told her they would

13

follow up with her at another point, while they suspended Edwards until they could meet with her in person. In her investigatory interview with Ihlenfeldt and Wilson, Edwards admitted her role in the incident, and she communicated that Cordero was an active and willing participant. However, Cordero was not disciplined in any way, despite the fact that she did not report the incident until two days after it occurred. Further, while AEMC points to Cordero's decision to remove the restraints as a reason it treated her differently, Edwards testified that she instructed Cordero to remove the restraints as soon as it was safe to do so.

Although this is a very close call, construed in the light most favorable to Edwards, this record evidence of AEMC's treatment of Cordero, as compared to its treatment of Edwards, could lead a reasonable jury to conclude that AEMC's proffered reason for terminating Edwards is pretextual.[3]

---

[3]    At oral argument, both parties relied on Robinson v. National Railroad Passenger Corp., No. CV 18-341, 2019 WL 3310333 (E.D. Pa. July 22, 2019), aff'd, 821 F. App'x 97 (3d Cir. 2020), to support their arguments about the comparator evidence in this case. The court in Robinson concluded that the plaintiff, who was fired following a train crash, could not establish pretext by demonstrating that he was treated less favorably than three other employees involved in the incident "because all three other employees chose to retire, resign or separate prior to a disciplinary hearing." Id. at *14.
    Robinson is instructive on the issue of whether Edwards can establish that she was treated differently than Picarella, who resigned. She contends AEMC treated Picarella more favorably because he was not suspended, while AEMC avers it would have fired Picarella for his role in the incident if he had not resigned.
    Because the evidence to which Edwards points with respect to Cordero's treatment is sufficient to withstand summary judgment, the Court need not

ii.  <u>Remaining arguments</u>

Edwards's remaining arguments in support of a finding of pretext are less persuasive.

First, Edwards argues AEMC's articulated reason for terminating her employment has changed over time. She argues AEMC has, at various times, cited the following as its stated reason for terminating her: (1) her alleged negligent care and the risk of harm to Doe; (2) her failure to document the restraint in Doe's chart; and (3) her alleged violation of AEMC's restraints policy.

However, it is far from clear that a reasonable jury considering the evidence to which Edwards points, even construed in her favor, could conclude that AEMC's proffered reason for terminating her has changed over time in a way that evinces pretext. Beginning with the Discharge Document and continuing through AEMC's representations before the Pennsylvania Human Relations Commission and in the instant action, AEMC has pointed to Edwards's use of the bedsheet restraint as its reason for terminating her. <u>Cf.</u> <u>Smith v. Borough of Wilkinsburg</u>, 147 F.3d 272, 281 (3d Cir. 1998) (concluding that the inconsistency between the employer's explanation that it "didn't renew

---

determine whether Edwards is similarly situated to Picarella or whether AEMC treated Picarella more favorably than Edwards.

[plaintiff's] employment contract because he failed to file a formal application" and its explanation citing plaintiff's "poor job performance" was "sufficient for a reasonable jury to view it as evidence of pretext leading to an inference of discrimination").

Next, Edwards argues Ihlenfeldt has treated Black employees less favorably than White employees, including by disproportionately disciplining Black employees. In support of this argument, she highlights record evidence indicating that Ihlenfeldt "terminated three employees (including Ms. Edwards) during the course of his employment with AEMC, and all of them were Black." Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 35, ECF No. 19. She further avers that Ihlenfeldt "only ever suspended two employees pending the outcome of an investigation (one being Ms. Edwards), and both of them were also Black." Id. at 35-36.

However, Edwards does not point to any record evidence indicating the other employees were terminated and/or suspended based on selective enforcement of AEMC policies. Cf. Williams v. Wells Fargo Fin. Acceptance, 564 F. Supp. 2d 441, 451 (E.D. Pa. 2008) (concluding a jury could reasonably infer the employer selectively enforced its policies where evidence suggested it was commonplace "for all employees, non-African American and African American, to send personal emails" during work hours and the employer "usually counseled or warned" employees who

violated the policy but fired several African American employees
who did so). And in response, AEMC points to record evidence
indicating that one of the Black employees to whom Edwards
points was terminated for assaulting another employee, and the
other was terminated for falsifying time. As such, it is not
clear that Ihlenfeldt's alleged treatment of Black employees
could lead the factfinder reasonably to believe that AEMC's
articulated reason for her adverse employment outcome was
pretextual.

Finally, Edwards argues the record indicates that
Ihlenfeldt harbors racial animus. In support of this argument,
she points to Facebook posts in which Ihlenfeldt commented on
protests following the death of George Floyd and on the issue of
systemic racism, among other things.

However, Ihlenfeldt made those comments in 2020, two years
after the events at issue. Their probative value is therefore
diminished, and it is not likely the comments would be
admissible at trial. See Fed. R. Evid. 403; Ryder v.
Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997)
(explaining that courts must consider "the temporal connection
between the statement and the challenged employment action,"
among other things, when ruling on admissibility); see also
Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 n.13 (3d
Cir. 1999) (noting that "it is not proper" to consider evidence

that would not be admissible at trial at the summary judgment stage).

For these reasons, Edwards's remaining arguments on the issue of pretext are less persuasive than the comparator evidence to which she points. However, Edwards's comparator evidence, standing alone, is sufficient for her to withstand summary judgment. See supra Section IV.A.3.i. Therefore, the Court need not determine whether the remaining evidence could cause a factfinder to "reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action," Fuentes, 32 F.3d at 764, or whether the evidence on which those arguments rely is admissible at trial.

Because Edwards has pointed to evidence from which a reasonable jury could find that AEMC's stated reasons for terminating her are a pretext for unlawful discrimination, AEMC is not entitled to summary judgment on Edwards's discrimination claims.

**B.   Damages**

In the alternative, AEMC argues that to the extent Edwards establishes liability, her damages should be limited for failure to mitigate. Specifically, AEMC seeks to limit Edwards's entitlement to back pay.

"[S]uccessful Title VII claimants have a statutory duty to mitigate damages." Booker v. Taylor Milk Co., 64 F.3d 860, 864 (3d Cir. 1995); see also 42 U.S.C. § 2000e-5 ("Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."). Whether a successful Title VII claimant has satisfied her duty to mitigate "is a determination of fact." Booker, 64 F.3d at 864.

Although the statute places the duty to mitigate on the plaintiff, "the employer has the burden of proving a failure to mitigate. To meet its burden, an employer must demonstrate that 1) substantially equivalent work was available, and 2) the Title VII claimant did not exercise reasonable diligence to obtain the employment." Id. (citations omitted).

"Generally, a plaintiff may satisfy the 'reasonable diligence' requirement by demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment." Id. at 865. In the context of keeping a new job, reasonable diligence requires the plaintiff to "act reasonably and in accordance with employer rules," and "[i]nvoluntary terminations from subsequent employment will toll back pay where the reasons for the termination are unrebutted and justified on the record." See Perez v. Lloyd Indus., Inc., No. 16-CV-1079, 2019 WL 3765657, at

*8 (E.D. Pa. Aug. 9, 2019) (first quoting <u>Brady v. Thurston</u>
<u>Motor Lines, Inc.</u>, 753 F.2d 1269, 1277 (4th Cir. 1985); and then
quoting <u>Richardson v. Tricom Pictures & Prods., Inc.</u>, 334 F.
Supp. 2d 1303, 1314 (S.D. Fla. 2004), <u>aff'd</u>, 183 F. App'x 872
(11th Cir. 2006)).

Here, Edwards was discharged from AEMC on April 9, 2018.
She testified that she spent the first few weeks after her
termination distraught and depressed and began applying for jobs
at the beginning of May. She subsequently obtained employment at
Elkins Crest but was terminated from that job. Approximately
seven months after her termination from Elkins Crest, she
obtained employment with Jefferson Health Northeast.

AEMC now argues any back pay award to which Edwards is
entitled should exclude both the month immediately following her
termination from AEMC and the seven months between her
employment at Elkins Crest and Jefferson Health Northeast.
AEMC avers Edwards failed to exercise reasonable diligence to
find and maintain substantially equivalent employment because
she "remained idle for one month after her termination from AEMC
before beginning her job search" and because, after obtaining
subsequent employment at Elkins Crest, "she was terminated for
cause two months later." Def.'s Mot. Summ. J. 27, ECF No. 17-1.

For her part, Edwards points to record evidence indicating
she actively sought employment a few weeks after her discharge

from AEMC, and that she reinitiated her job search immediately upon her discharge from Elkins Crest. She also points to record evidence that she was terminated from her position at Elkins Crest after she called out sick for three consecutive days during her probationary period because she had injured her back. Edwards avers these absences were unavoidable.

Construing this record evidence in the light most favorable to Edwards, the Court cannot conclude, as a matter of law, that Edwards failed to exercise reasonable diligence in mitigating her damages. Because the factfinder must make this determination, AEMC is not entitled to partial summary judgment on the issue of limiting back pay damages.

## V.   CONCLUSION

For the foregoing reasons, the Court will deny AEMC's motion for summary judgment on Edwards's discrimination claims, as well as its motion for summary judgment on the availability of back pay damages.